**HERSHELL GILL CONSULTING ENGINEERS, INC., et al. Plaintiffs**

v.

**MIAMI–DADE COUNTY, Florida, et al. Defendants**

**No. 98–2300–CIV–JORDAN.**

United States District Court, S.D. Florida, Miami Division.

Aug. 24, 2004.

Charles S. Caulkins, Fisher & Phillips, Fort Lauderdale, FL, Herbert P. Schlanger, Atlanta, GA, for Plaintiff.

**1310**

Robert A. Cuevas, Jr., Dade County Attorney's Office, Miami, FL, for Defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

JORDAN, District Judge.

A little more than six years ago, the Eleventh Circuit upheld Judge Kenneth Ryskamp's ruling that Miami–Dade County's Minority and Women Business Enterprise (MWBE) programs violated the Fourteenth Amendment's Equal Protection Clause as applied to sectors of the construction contracting industry. *See Engineering Contractors Ass'n v. Metropolitan Dade County*, 943 F.Supp. 1546 (S.D.Fla.1996), *aff'd*, 122 F.3d 895 (11th Cir.1997) (*ECA*). Despite this adverse decision, Miami–Dade County did not amend, modify, or repeal the remaining sections of its MWBE programs, and further litigation predictably ensued.

This case involves a post-*ECA* challenge, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and under the Equal Protection Clause of the Fourteenth Amendment, *see* 42 U.S.C. § 1983, to sections of the MWBE programs establishing "participation goals" for minority and women business enterprises in awarding County architectural and engineering (A & E) contracts. The plaintiffs—Hershell Gill Consulting Engineers, Inc. and Brill and Rodriguez, Inc.— are engineering firms owned by white males. The defendants are Miami–Dade County, former County Manager Merritt Stierheim (sued only in his official capacity), and various former and current County Commissioners sued in their official and individual capacities (Betty Ferguson, Barbara Carey–Shuler, Bruno Barreiro, Pedro Reboredo, Gwen Margolis, Dorrin Rolle, Dennis Moss, Miriam Alonso, Katy Sorenson, Jimmy Morales, Javier Souto, Miguel Diaz de la Portilla, and Natacha Millan).[2] The Women's Business Enterprise Group (WBEG) intervened on behalf of the County and actively participated at the preliminary injunction hearing and at trial. The Urban Design Professionals Association—a trade association representing the interests of black professional engineers, architects, and design professionals—also intervened on the County's side, but was subsequently dismissed from the case for failing to obtain substitute counsel.

As explained below, the MWBE programs are unconstitutional as applied to A & E contracts, and will be permanently enjoined in that sphere. The Commissioners are absolutely immune in their individual capacities for their votes in favor of the MWBE programs and their subsequent decisions to not repeal or amend the programs. But with respect to their votes to apply MWBE measures to A & E contracts that were presented to them, the Commissioners were acting in their administrative capacities, and do not receive absolute immunity. Because the law was clearly established, at least since *ECA*, that the MWBE programs were unconstitutional absent the requisite evidentiary support, the Commissioners are not entitled to qualified immunity and are liable for any compensatory and punitive damages in their individual capacities. The plaintiffs, however, have failed to prove any compensatory damages, and punitive

---

1. This amended order corrects some typographical errors and contains some stylistic changes.

2. Alex Penelas, the Mayor of Miami–Dade County, was initially sued in his individual and official capacity because, as a County Commissioner in 1994, he voted in favor of the MWBE programs. The plaintiffs, however, voluntarily dismissed all claims against Mayor Penelas.

damages are not warranted. The plaintiffs will only be awarded nominal damages and attorney's fees and costs, for which the Commissioners and the County will be jointly and severally liable.

## I. BACKGROUND

The County's MWBE programs are no strangers to legal challenges. In *South Florida Chapter of Associated General Contractors v. Metropolitan Dade County*, 723 F.2d 846 (11th Cir.1984), the Eleventh Circuit upheld an earlier version (the Black Business Enterprise (BBE) program) in its entirety. In so doing, the Eleventh Circuit followed Chief Justice Burger's plurality opinion in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The standard Chief Justice Burger used to analyze the constitutionality of an affirmative action program in *Fullilove* was neither strict scrutiny nor any other traditional standard of equal protection review. *See, e.g., id.* at 473, 490–92, 100 S.Ct. 2758.

Five years after the Eleventh Circuit decided *Associated General Contractors,* the Supreme Court abandoned the *Fullilove* standard for analyzing state and local race-based remedial programs, holding that such programs must satisfy strict scrutiny to pass constitutional muster. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–95, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (four-Justice plurality); *id.* at 520, 109 S.Ct. 706 (Scalia, J., concurring) (agreeing that "strict scrutiny must be applied to all governmental classifications by race"). Following the *Croson* decision, several non-minority plaintiffs brought a second constitutional challenge to Miami–Dade County's BBE program. That case, *Capeletti Bros., et al. v. Metro. Dade County, et al.,* No. 90–0678–Civ–Ryskamp, was tried in the Southern District of Florida in July of 1992. Before Judge Ryskamp issued his opinion, however, the parties reached a settlement and stipu-

lated to a dismissal of the action with prejudice.

In September of 1994, six trade associations whose members regularly performed work on County construction projects filed a third suit in the Southern District of Florida. The complaint named the County, its Commissioners, and certain other related parties as defendants. The trade associations challenged the same MWBE programs at issue here, but only as they applied to certain sectors (Standard Industry Classifications (SIC) 15, 16, and 17) of the construction industry. Judge Ryskamp struck down the three MWBE programs as applied, and the Eleventh Circuit affirmed. *See See Engineering Contractors Ass'n v. Metropolitan Dade County,* 943 F.Supp. 1546 (S.D.Fla.1996), *aff'd,* 122 F.3d 895 (11th Cir.1997) (*ECA*). The County subsequently enacted a Community Small Business Enterprise (CSBE) program for construction contracts, but continued to apply racial, ethnic, and gender criteria to its purchases of goods and services in other areas, including its procurement of A & E services.

## II. THE COUNTY'S MWBE PROGRAMS

At issue in this case are three sections of the MWBE programs enacted by the Miami–Dade County Board of Commissioners, specifically, §§ 2–8.2, 2–8.2.3, and 2–8.2.4 of the County Code: (1) the Black Business Enterprise (BBE) program, enacted in 1982 and most recently amended in 1994; (2) the Hispanic Business Enterprise (HBE) program, enacted in 1994; and (3) the Women Business Enterprise (WBE) program, enacted in 1994. For ease of reference, these three programs are collectively referred to as the MWBE programs.

In order to qualify for participation in one of the MWBE programs, a business must be owned and controlled by one or

more black, Hispanic, or female individuals, and must have an actual place of business in Miami–Dade County. MWBE joint ventures must have at least one member certified under one of the three MWBE programs. Each MWBE participant must also demonstrate that it does not exceed the size limits for "small business concerns" as defined by the Small Business Administration of the United States Department of Commerce. If an MWBE exceeds that size limit, however, it may retain its certification if it demonstrates that "it continues to experience the kinds of racial [or gender] discrimination addressed by [the programs]." County Code § 2–8.2(3)(e).

The MWBE programs apply to certain classes of County contracts for which participation goals have been set. This case concerns only architecture and engineering (A & E) contracts, which means that only a portion of SIC 871 of County contracts is involved. For this class of contracts, the County has set participation goals of 12% for BBEs, 25% for HBEs, and 17% for WBEs. The participation goals apply to all A & E contracts in excess of $25,000 that are funded in whole or in part by the County. The County is required to make every reasonable effort to achieve the participation goals, and may use any of the following five contract measures to do so:

● Set–Asides—This measure provides that a contract is set aside for bidding solely among MWBEs. In general, the County may use the set-aside measure if there are at least three MWBE businesses available to perform the contract. The County may also waive competitive bidding if there are at least two MWBEs available, provided neither of them has been awarded a County contract for like goods or services in the last three years, and a price analysis has been done to ensure that the price is competitive.

● Subcontractor Goals—This measure requires a prime contractor to subcontract a certain percentage of work to MWBEs. The percentage is determined on a case-by-case basis. A waiver is available if the prime contractor can demonstrate that MWBEs are not available to do the work at a competitive price.

● Project Goals—This measure allows the County to create a pool of MWBE subcontractors from which it selects firms for specified types of work under County contracts.

● Bid Preferences—This measure artificially "reduces" an MWBE bid price by as much as 10 % for purposes of determining the lowest bid. The actual price the County pays for the work is unaffected by this "reduction."

● Selection Factors—This measure is similar to a bid preference, but operates on factors other than price. For instance, when bid evaluation procedures assign weights to various factors, MWBE performance on those factors may be boosted by up to 10 %.

Once an A & E contract is identified as being subject to a participation goal, it is submitted to a review committee to determine whether a contract measure should be applied. The Board of County Commissioners (some times referred to as the County Commission) ultimately decides whether to apply such a measure, and its decision is appealable to the County Manager. The County Manager's decision is final, unless the County Commission exercises its discretion to review and override it.

Significantly, each year the County must review the MWBE programs for their efficacy and revise the participation goals based on an annual study by the Department of Business Development. *See* County Code §§ 2–8.2(3)(j)–(k), 2–

8.2.3(3)(j)–(k), 2–8.2.4(3)(j)–(k). Despite this requirement—expressly stated in the text of the MWBE ordinances—from 1994 to 2000 the Commission did not conduct a study—with the exception of the 1998–1999 studies presented by the County Manager finding that parity had been reached (discussed later)—and never adjusted or revised the MWBE participation goals. *See, e.g.,* Trial Transcript at 255, 282, 284, 406. In other words, the participation goals for the three MWBE programs challenged here have remained unchanged since 1994.

Every five years, when the Survey of Minority–Owned Business Enterprises is published by the United States Census Bureau, the County Commission must decide whether to continue the programs. Two Commissioners testified at trial that they would have continued the MWBE programs (and their participation goals) had a preliminary injunction not been entered. *See* Trial Transcript at 219–20, 235.

## A. THE CONTRACTING PROCESS

Miami–Dade County, like individuals, corporations, and other governmental entities, utilizes A & E services in connection with a myriad of construction and maintenance projects. The system the County uses to award contracts can be generally described as follows.

First, when a need for architectural or engineering services is identified or anticipated by a County agency, the agency requests that the County Commission issue a request for proposals (RFP). After review, staff determines whether a contract measure will be included in the RFP. The Commission then votes whether to issue the RFP as recommended.

Second, the RFP will identify by specialty (architecture, civil engineering, structural engineering, etc.) which entity will be the prime consultant. Only firms certified by the Department of Public Works in that specialty may submit responses to the RFP. The RFP may (and usually does) require that firms certified in other specialties be included as subconsultants. More often than not, when an RFP calls for an architecture firm as a prime consultant, it requires the use of an engineering firm as a subconsultant, and *vice-versa.*

Third, the agency issuing the RFP will review the various responses. This review includes, among other things, an examination of the qualifications of the firms responding, the history of those firms in working on similar projects, their compliance with any contract measures previously imposed, their work history, and their reliability.

Fourth, the issuing agency will "cull" the responses and "short list" a number of firms. These firms will then be invited to make more detailed presentations to the agency.

Fifth, the agency will select the firm it believes is best qualified to perform the project in question and will enter into negotiations concerning price. If the negotiations are successful, the contract goes to the County Commission for approval. If the negotiations are unsuccessful, the agency enters into negotiations with the next most qualified firm. This process can be repeated until an acceptable agreement is reached.

## B. THE COUNTY MANAGER'S REPORTS OF PARITY

In May of 1998, after the Eleventh Circuit's decision in *ECA,* counsel for the plaintiffs in this case wrote to the County Commissioners requesting that they discontinue the use of contract measures on A & E contracts, and threatening legal action if the measures continued. *See* Plaintiffs' Exh. 86. In response to this letter, the County Manager appointed staff to formulate new processes regarding, among other

things, the creation of a CSBE program for A & E contracting. *See* Plaintiffs' Exh. 6 at 1.

In a memorandum dated October 28, 1998, the County Manager reported to the Commissioners that, according to a study by the County's Department of Business Development, "[i]t is clear that the County has reached parity in the areas of architecture and engineering for Black, Hispanic, and women owned firms." *Id.* at 2. The study, which tracked A & E dollars awarded by the County, showed that Hispanics constituted .36% of certified firms and received 58% of dollars awarded; that blacks constituted 7.5% of certified firms and received 16.39% of dollars awarded; and that women constituted 14.66% of certified firms and received 17.1% of dollars awarded. *See* Plaintiffs' Exh. 10; Trial Transcript at 212–14, 389–91.

On November 24, 1998, the County Manager transmitted to the Commissioners the text of a proposed ordinance which would establish a CSBE program for A & E contracts and recommended its adoption. *See* Plaintiffs' Exh. 7. The Commissioners, however, refused to follow that recommendation because they felt the study did not present a complete picture of the marketplace. *See, e.g.,* Trial Transcript at 53, 95, 110–11, 125, 232–33, 365–66, 410.

By the time the Commissioners held their December 15, 1998, meeting, the County Manager had submitted another memorandum recommending that no further measures be utilized for A & E contracts because parity had been reached. *See* Plaintiffs' Exh. 9 at 8. The Commissioners indicated that they doubted the figures presented by the County Manager showing parity. They were concerned that the numbers reflected amounts awarded rather than amounts actually paid, and felt that an analysis of the latter figure might lead to a finding of disparity. Indeed, some minority A & E contractors appeared before the Commissioners and made that same claim. *See* Trial Transcript at 110–11, 122–25. Accordingly, the County Manager initiated a study focusing on amounts actually paid in A & E contracting.

The result of the subsequent study was the same. In a memorandum dated February 2, 1999, the County Manager informed the Commissioners that this additional analysis also indicated that parity had been reached. *See* Plaintiffs' Exh. 11. The memorandum succinctly states the evidence then available to the Commissioners:

> On December 15, 1998, I presented to the Board [the Commission] a report on participation goals for Fiscal Year 1996–97 to be used as a basis for prospective goals for 1998 on all County contracts including architecture, landscape architecture, engineering, surveying and mapping services. The analysis indicated that parity had been reached in the areas of architectural and engineering services for Black, Hispanic and Women-owned firms. The Board raised concerns that the analysis was based on dollars awarded, and that staff was unable to present an analysis of annual dollars paid. At that time the Board deferred the projects held in abeyance. On January 21, 1999, I presented a report (Item 7(D)4a on today's agenda) to the Board based on an analysis using actual dollars paid to prime consultants on architectural and engineering contracts during Fiscal Years 1996–97. This analysis shows that the County has reached parity for Black, Hispanic and Women-owned firms in the areas of architectural and engineering services. *Based on all the analyses that have been performed, the County does not have a basis for the establishment of participation goals which would allow staff to apply contract measures.*

*Id.* (emphasis added).[3] The Commissioners were also informed that "there was even less evidence to support [the MWBE] programs as applied to architects and engineers than there was in contract construction." Trial Transcript at 202.

At the same meeting where the County Manager presented his findings and recommendations, the Commissioners chose not to enact a CSBE program, and voted instead to continue the MWBE participation goals at their previous levels in the award of A & E contracts. By then the goals had remained the same for about five years without any revision.

Although the Commissioners indicated that they needed more information, and voted to continue applying contract measures until a further study could be conducted, there is absolutely no evidence that such a study was even initiated until this action had been pending for 18 months. Even at trial, some Commissioners were unaware whether this further study had in fact been completed. *See, e.g.,* Trial Transcript at 52, 66–67, 96, 199–200, 406. Despite the lack of a factual basis for A & E measures, the Commissioners continued to apply these measures until they were enjoined from doing so in October of 2000. According to their testimony at trial, some Commissioners continued to believe that, notwithstanding the lack of evidence, discrimination existed with respect to A & E contracting. *See, e.g.,* Trial Transcript at 413 ("I don't have any evidence to dispute it [disparity], but I know it's not true."). The mindset of at least some of the Commissioners was to go forward with the MWBE programs as they related to A & E services, and to defend the programs if they were challenged in court. *See* Trial Transcript at 234, 255–56. Not surprisingly, this action ensued.

## C. DR. CARVAJAL'S REPORT

In May of 2000, about 18 months after the lawsuit was filed, the County and the intervenors hired Dr. Manuel J. Carvajal, an econometrician who teaches at Florida International University, to conduct a study on architects and engineers in Miami–Dade County. His final report consisted of four parts: (1) data identification and collection of methodology for displaying the research results; (2) presentation and discussion of tables pertaining to architecture, civil engineering, structural engineering, and awards of contracts in those areas; (3) analysis of the structure and empirical estimates of various sets of regression equations, the calculation of corresponding indices, and an assessment of their importance; and (4) a conclusion that there is discrimination against women and Hispanics—but not against blacks—in the fields of architecture and engineering.

When the trial date was continued, the plaintiffs moved for a preliminary injunction. During the preliminary injunction hearing (which constituted the first two days of trial pursuant to the provisions of Rule 65(a)(2) of the Federal Rules of Civil Procedure), the defendants and the intervenors presented all of the evidence—both statistical and anecdotal—then available in support of the three MWBE programs. I found that evidence insufficient, and in October of 2000, before Dr. Carvajal's final report was submitted, issued a preliminary injunction prohibiting use of the three MWBE programs as applied to A & E contacts and services.[4] The remainder of

---

**3.** At trial, the County Manager testified that the study focusing on dollars paid showed that parity had been reached for Hispanics (36% of certified firms receiving 53% of dollars paid) and blacks (7.5% of certified firms receiving 11.29% of dollars paid). With re-spect to women, the study indicated that they constituted 14.66% of certified firms and received 10.82% of dollars paid. *See* Trial Transcript at 284–87.

**4.** The preliminary injunction was modified in early 2001 to permit the County to award two

the trial was conducted intermittently over the next eight months. To obviate the need for a remand from the Eleventh Circuit, and given that a preliminary injunction was in place, this order was held pending the Supreme Court's decisions in *Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), and *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and cases interpreting those decisions.

## III. THE CONSTITUTIONAL STANDARDS

### A. RACE AND ETHNICITY

■ The BBE and HBE programs create preferences on the bases of race and ethnicity. The applicable constitutional standard for analyzing these programs, therefore, is strict scrutiny. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *Croson*, 488 U.S. at 494, 109 S.Ct. 706; *Johnson v. Board of Regents of the University of Georgia*, 263 F.3d 1234, 1243 (11th Cir.2001); *Bass v. Board of County Comm's*, 256 F.3d 1095, 1116 (11th Cir. 2001); *ECA*, 122 F.3d at 906. Strict scrutiny requires that an affirmative action program be based on a compelling governmental interest, and that it be narrowly tailored to achieve that interest. *See, e.g., Adarand*, 515 U.S. at 227, 115 S.Ct. 2097; *ECA*, 122 F.3d at 906.

■ The County argues that its affirmative action program is in place to remedy past and current discrimination in the A & E industry. Remedying past or present discrimination is widely accepted as a compelling governmental interest, so the critical question here is not the nature of the County's interest but the sufficiency of the evidence of discrimination and the narrow tailoring of the remedy. *See, e.g., ECA*,

122 F.3d at 906 (citing *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1565 (11th Cir.1994)).

■ The proponent of a racial or ethnic classification bears the burden of proving that it meets strict scrutiny, *see, e.g., Johnson*, 263 F.3d at 1244, and must present a strong basis in evidence for the classification. *See, e.g., ECA*, 122 F.3d at 906 ("If a race- or ethnicity-conscious affirmative action program is to be upheld, 'the district court must make a factual determination that [there exists] a strong basis in evidence' to support the conclusion that remedial action is necessary.") (quoting *Ensley Branch*, 31 F.3d at 1565). A strong basis in evidence cannot rest on a mere claim of societal discrimination or on simple legislative assurances of good intentions. *See ECA*, 122 F.3d at 907. A municipality, however, can justify affirmative action by demonstrating "gross statistical disparities" between the proportion of minorities awarded contracts and the proportion of minorities willing and able to do the work. *See ECA*, 122 F.3d at 907. Presenting anecdotal evidence is also a permissible method of showing discrimination, especially if buttressed by statistical data. *See ECA*, 122 F.3d at 907. "[I]f if the [County] could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local [A & E] industry," then "[it] could take affirmative steps to dismantle such a system." *Croson*, 488 U.S. at 492, 109 S.Ct. 706. *See also ECA*, 122 F.3d at 907.

Given the County's asserted interest—remedying past and current discrimination in the A & E industry—the Supreme Court's recent decisions in *Grutter*, 123 S.Ct. at 2339–40, and *Gratz*, 123 S.Ct. at

---

contracts containing MWBE contract measures. The plaintiffs did not oppose (nor did they consent to) that modification. In all

other respects, the injunction has otherwise remained in place.

2426–27—which recognize that a university's goal of attaining student body diversity for its educational benefits can constitute a compelling state interest—do not alter the equal protection framework discussed above. In other words, *Gratz* and *Grutter* do not modify *Croson* or *Adarand* in the area of public contracting. *Cf. Petit v. City of Chicago,* 352 F.3d 1111, 1114 (7th Cir.2003) (applying *Grutter* diversity rationale to promotion decisions of large metropolitan police force in a "racially and ethnically divided major American city like Chicago"). Nevertheless, some of the language in *Gratz* and *Grutter* is helpful with several of the issues presented here.

## B. GENDER

■ In order to survive a constitutional challenge, the County's gender-conscious WBE program must withstand intermediate scrutiny. *See Danskine v. Miami Dade Fire Dept.,* 253 F.3d 1288, 1293 (11th Cir.2001); *ECA,* 122 F.3d at 908. *See also Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (intermediate scrutiny is the appropriate test to apply to a gender-based classification favoring women). Under intermediate scrutiny, the government must show that the gender-based classification serves an important governmental objective, and that it is substantially related to the achievement of that objective. *See Nevada Dept. of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 1978, 155 L.Ed.2d 953 (2003); *ECA,* 122 F.3d at 908; *Danskine,* 253 F.3d at 1294.

The County asserts the same justification for the WBE program as for the BBE and HBE programs: remedying past and current discrimination in the A & E industry. This objective is clearly "important" enough to sustain a gender-conscious affirmative action program. *See, e.g., Califano v. Webster,* 430 U.S. 313, 318, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Danskine,*

253 F.3d at 1295; *ECA,* 122 F.3d at 908. The constitutionality of the program, once again, turns on the sufficiency of the evidence of discrimination against women in the A & E industry and the fit of the chosen remedy (i.e., whether the remedy is "substantially related" to achieve the stated goal). *See Danskine,* 253 F.3d at 1294; *ECA,* 122 F.3d at 909.

■ The level of evidentiary sufficiency required by intermediate scrutiny is "something less than the 'strong basis in evidence' required to bear the weight of a race- or ethnicity-conscious program." *ECA,* 122 F.3d at 909. Stated differently, "in the gender context less evidence is required." *Id.* Nevertheless, "a proponent of a gender-conscious affirmative action program must present not only probative evidence of discrimination, but sufficient probative evidence of it." *Id.* at 910. *See also Danskine,* 253 F.3d at 1294.

■ Two principal guidelines frame the intermediate scrutiny analysis. First, while the County must demonstrate past discrimination against women, that discrimination need not have been by the County itself. *See Danskine,* 253 F.3d at 1294; *ECA,* 122 F.3d at 910; *Ensley Branch,* 31 F.3d at 1580. Second, "the intermediate scrutiny evidentiary analysis is not to be directed toward mandating that gender-conscious affirmative action is used only as a 'last resort,' but instead to ensuring that the affirmative action program is 'a product of analysis rather than a stereotyped reaction based on habit.' " *ECA,* 122 F.3d at 910 (citations omitted). Thus, the intermediate scrutiny evidentiary analysis "turns on whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed." *ECA,* 122 F.3d at 910 (quoting *Ensley Branch,* 31 F.3d at 1581). *See also Danskine,* 253 F.3d at 1294.

## IV. THE FIRST PRONG: "COMPELLING INTEREST" & "IMPORTANT GOVERNMENT OBJECTIVE"

■ The County and the intervenors presented both statistical and anecdotal evidence in an attempt to show that discrimination exists in the A & E industry. The statistical evidence was presented through Dr. Carvajal, an econometrician who was personally involved with the study prepared by the County in support of the ordinances at issue in the *ECA* case. Additionally, the intervenors presented, as anecdotal evidence, the testimony of female architects and engineers who said they have experienced discrimination in the awarding of County contracts, as well as in the marketplace.

It was not until Dr. Carvajal completed his study during the course of this litigation, in March of 2001, that any study concerning the MWBE programs was finalized. Thus, much of the statistical evidence presented by the intervenors and the County is "post-enactment" evidence, that is, evidence derived from data relating to the time subsequent to the County's enactment of the MWBE programs. "Although post-enactment evidence is admissible to determine whether an affirmative action program is constitutional, such evidence carries with it the hazard that the program at issue may itself be masking discrimination that might otherwise be occurring in the relevant market." *ECA*, 122 F.3d at 912. Accordingly, I will keep the potential effect of the MWBE programs in mind when analyzing the evidence presented by the County and the intervenors. Dr. Carvajal's study, by focusing on annual volume of business rather than solely on the award of County contracts, looks beyond the small percentage of A & E contracts that would be subject to the MWBE programs, thereby limiting (at least in this respect) the potential for skewed results.

## A. STATISTICAL EVIDENCE

### 1. THE STUDY

Dr. Carvajal attempted to identify and measure potential gender and ethnic disparities in the fields of architecture, structural engineering, and civil engineering, and, if such disparities existed, to determine whether they could be attributed to discrimination. His analysis applied geographically to Miami–Dade County and was developed along two paths of inquiry. One explored the nature and distribution of awards issued by the County during the period of 1995–1999. The other probed the marketplace conditions experienced by A & E firms.

The study used four data sets. Three were designed to establish the marketplace availability of firms—one set each for architecture, structural engineering, and civil engineering. The fourth focused on awards issued by the County. Dr. Carvajal first tried to identify the "universe" of firms competing in each market. He did so using the local 1999–2000 Bell South telephone directory, a list compiled by infoUSA, and a list of firms registered for technical certification with the County's Department of Public Works. Additionally, for architecture firms only, Dr. Carvajal utilized a list of firms which had been issued an architecture professional license.

Dr. Carvajal and his staff conducted a telephonic survey in an attempt to obtain information from each firm in each of the three markets. The data solicited in the survey included the firms' gender/ethnic classification, capacity/experience input variables (i.e., number of years in business, number of employees, and number of architects/engineers), and annual volume of business as a measure of performance. At least three attempts were made to contact each firm by telephone. The outcome of

the survey revealed a response rate of around 65%.

The data was further enhanced by information provided by some of the firms to the County. Firms that wish to be considered for County awards must, as noted earlier, be technically certified by the Department of Public Works prior to bidding for any project. Certification takes place after the firm demonstrates that it possesses the technical capability and expertise to carry on a project in a particular specialty. This involves, among other things, filling out an annual application form which contains questions pertaining to firm characteristics. Dr. Carvajal used some of this information in his study, including certification information and capacity/experience indicators (i.e., number of years in business, number of technical employees, and number of architects/engineers).

The County's Department of Business Department further classifies firms as WBEs, BBEs, HBEs, or none of the above. These classifications do not necessarily coincide with the gender and/or ethnic group of the firm's owner identified in the survey. To qualify as an MWBE, firms need to meet certain other criteria, such as an upper-revenue limit. Only firms classified as MWBEs are eligible to bid for projects earmarked as "set aside" for women- or minority-owned business enterprises. Despite these qualification criteria, Dr. Carvajal's study determined a firm's gender/racial/ethnic classification by the firm's response to the survey.

The award data set was developed from a list of awards issued by the County from 1995 to 1999. The data from this source included the date and amount of the award, whether or not "set aside" or "goal participation" conditions existed, and an identification of the selected prime consultant.

The empirical findings of the study were presented in two parts. The first part consisted of five sets of tables showing various indicators of parity or disparity by gender, racial, and ethnic group. The second part dealt with regression analyses, which attempted to quantify the impact of the gender and/or ethnic disparities attributed to discrimination.

Dr. Carvajal determined that the analysis of award data could not be truly reliable. He reasoned that this was due to the small number of firms available for observation in this setting. Accordingly, he concentrated his analysis on the information obtained through the survey relating to each firm's annual volume of business in the overall marketplace.

According to the survey, 13% of all identified architecture firms are owned by women, and they account for 2.2% of the annual volume of business. Black-owned firms represent 3.9% of the identified architecture firms, and they account for 0.9% of the annual volume of business. Hispanics own 50.2% of architecture firms, but account for only 17.7% of the annual volume of business. Similar disparities were shown for both structural and civil engineering firms. From this information, Dr. Carvajal concluded that "[o]bvious disparities exist between percentage of firms and percentage of annual volume of business of women- and minority-owned firms." Defendants' Exh. 48 at 7. He also determined that neither the removal of "outliers"— large, often public owned firms whose annual volume of business was beyond the 99th percentile—nor controlling for capacity and experience substantially changed his conclusions.

Dr. Carvajal conducted regression analyses in order to determine the effect a firm owner's gender or ethnicity had on certain dependent variables. As discussed above, when he used amounts awarded by

the County as the dependent variable, the results were unreliable because the "empirical evidence from the awards regression equations [was] ambiguous and encumbered by a limited pool of observation units." *Id.* at 16. When using a firm's annual volume of business as a dependent variable, however, Dr. Carvajal found that the disparities present in each of the three specialty areas were due to the firm's gender/ethnic classification. He went on to perform variants of the equations in order to further bolster his conclusions. He performed the equations (1) using certification rather than survey data for the experience/capacity indicators, (2) with the outliers deleted, (3) with publicly owned firms deleted, (4) with the dummy variables reversed, and (5) using only currently certified firms. His results remained substantially unchanged using each of these variants.

Based on this analysis of the marketplace data, Dr. Carvajal concluded, in sum, that

a large part of the gross statistical disparities observed in the annual volume of business levels of women- and Hispanic-owned firms can be attributed to discrimination. The statistically significant regression coefficients of the dummy variables throughout the marketplace equations indicate that women- and Hispanic-owned firms experience lower levels of volume of business than do non-women- and non-Hispanic-owned firms, respectively, even after adjusting for the presence in the equation of firms' years in business, number of employees, and/or number of architects/engineers. Thus, the adverse effects of gender and Hispanicity [sic] are manifested in the sign and values of the regression coefficients and cannot be attributed solely to differences in firms' capacity/experience. The discrimination indices projected from the regression estimates are evi-

dence of gross statistical disparities in annual volume of business.

*Id.* at 25. Dr. Carvajal did not find sufficient evidence of discrimination against blacks.

## 2. ANALYSIS

The critical questions are whether Dr. Carvajal's study constitutes a "strong basis in evidence" of discrimination to justify the continuance of the race/ethnic-conscious measures under strict scrutiny, and whether it constitutes "sufficient probative evidence" of discrimination to justify the continuance of the gender-conscious measures under intermediate scrutiny. As to each of these questions, the answer is no.

Initially, I find—and it is essentially uncontested—that there is no disparity indicating any underutilization of MWBEs or of minority-owned firms in the award of contracts by the County itself for A & E services, nor is there any significant underutilization of MWBEs in the contracts they were awarded. Dr. Carvajal's analysis of the County awards data corroborates the County Manager's conclusion that parity has been reached insofar as County awards and dollars are concerned. Indeed, the results of Dr. Carvajal's analysis of the award data led him to conclude that the "awards approach is a dead end, and the relevant scope of analysis is the marketplace, using annual volume of business as the dependent variable." Defendants' Exh. 48 at 22. If anything, the data indicates an overutilization of minority-owned firms by the County in relation to their numbers in the market or their capacity. This is consistent with the information given to the Commissioners by the County Manager in late 1998 and early 1999.

I will, therefore, turn to the analysis of the marketplace data and the results of that aspect of Dr. Carvajal's study. Based on the study, the County has conceded

that the evidence of discrimination against blacks is insufficient to support the BBE program. I, therefore, need look no further into that aspect of the data or analysis. The County's BBE program in the A & E industry is unconstitutional under the strict scrutiny standard, and will be permanently enjoined. The remainder of this analysis will focus on the constitutionality of the HBE and WBE programs.

As discussed in the previous section, Dr. Carvajal conducted a telephonic survey to gather data for the marketplace aspect of his study. Using this data, found at Plaintiffs' Exhibits 90 and 91, it is possible to derive information about the characteristics of the firms. This information indicates that the data upon which Dr. Carvajal relied in concluding that disparity exists in the A & E industry as to Hispanics and women is both unreliable and inaccurate. There are several reasons for this conclusion, and I discuss them below, understanding that the failure to control for particular variables generally "will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).

### (a). THE DATA FAILS TO PROPERLY MEASURE THE GEOGRAPHIC MARKET

The data Dr. Carvajal gathered in an attempt to measure firm participation in the Miami–Dade County market for the three separate services (architecture, civil engineering, and structural engineering) is both over- and under-inclusive. It is over-inclusive in that it fails to exclude from the annual volume of business figures—the all-important dependent variable—amounts earned in markets outside Miami–Dade County by the surveyed firms. It is under-inclusive in that it fails to include some firms from neighboring counties which provide A & E services in Miami–Dade County.

The over-inclusiveness stems from Dr. Carvajal's practice of defining a firm's annual volume of business by its *total* receipts. No attempt was made to limit the number to the volume of business done in Miami–Dade County, and a firm providing architecture or engineering services in another county or state had receipts from that business included in its annual volume statistic. *See* Trial Transcript at 870–72. This creates a serious problem, because the County must show a strong basis in evidence of past or present discrimination within its own geographic boundaries in order to sustain its MWBE programs. *See Sherbrooke Turf, Inc. v. Minnesota Dept. of Transportation,* 345 F.3d 964, 970–70 (8th Cir.2003). If the evidence is skewed by the inclusion of extra-County volume of business data, its reliability and accuracy for this purpose is undermined.

The under-inclusiveness results from Dr. Carvajal's reliance on County certification in compiling his firm list. A firm with an office in neighboring Broward County, for instance, although perhaps not certified in Miami–Dade County—because it had not sought to do work for the County itself could still do work in the County and generate some volume of business there. This income, however, would not be included in the County's numbers. Thus, Dr. Carvajal's marketplace analysis is incomplete.

Additionally, the volume figures fail to account for revenue received as, or paid to, subcontractors or subconsultants. In A & E contracting, up to 50% of a project's total dollar amount is paid to subconsultants. Not accounting for this aspect of annual volume results in a distortion of the volume figures. The plaintiffs' expert, Dr. John Lunn, concluded that this was "a serious flaw. If firms differ in the extent to which they work as a prime or as a sub, and in the extent to which they utilize subs

when they are the prime consultant, then the dollar values used in this measure are not comparable." Plaintiff's Exh. 100 at 14. On the record before me, I agree with Dr. Lunn's conclusion.

### (b). THE DATA FAILS TO PROPERLY MEASURE THE PRODUCT MARKET

In addition, the annual volume figures fail to accurately measure the three product markets analyzed in the study: architecture, civil engineering, and structural engineering. For firms providing services in multiple markets, Dr. Carvajal reported the total volume of the firm in each of these markets. *See* Trial Transcript at 604–05. For example, if a firm generated an annual volume of $100,000 from architectural services and $15 million from civil engineering services, its annual volume of business was reported as $15,100,000 in *both* the architectural and engineering data sets. Thus, the total volume in each of the product markets is clearly overstated.

Moreover, each of the product markets has distinct submarkets which should be treated separately. Steve Spratt, a senior assistant to the County Manager, testified as a person familiar with the process of selecting architects and engineers for County projects. Mr. Spratt explained that an important criterion in the selection process is the firm's expertise in the particular kind of work being done. *See* Trial Transcript at 148. This testimony, corroborated by Hershell Gill, the owner of Hershell Gill Consulting, *see* Trial Transcript at 447–49, reveals that not all architects and engineers included in the survey are qualified to compete for all projects. While some of the larger firms may be able to compete across the board, many of the smaller firms are limited in the range of jobs for which they may submit responses. Dr. Carvajal, however, treated all firms as "willing and able," i.e., "qualified," to perform *all* work within their product market. *See* Trial Transcript at 705. Once again, this renders the annual volume of business figure unreliable and inaccurate.

### (c). THE MARKETPLACE DATA SURVEY IS UNRELIABLE

Perhaps the most glaring problem with the study is the unreliability of the survey data which formed the basis for Dr. Carvajal's conclusion that discrimination was and is present in the Miami–Dade County A & E market. This unreliability is particularly apparent in the most crucial component of the study—the annual volume of business data.

Questions in a survey must be clear, precise, and unbiased. *See generally* FEDERAL JUDICIAL CENTER. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 248–49 (2nd ed.2000). As the Supreme Court has explained, *see Ramdass v. Angelone*, 530 U.S. 156, 172–73, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), courts have the authority to exclude or minimize survey results which are deficient. This is one of those cases in which a survey is not persuasive due to deficiencies. *See Bazemore*, 478 U.S. at 400, 106 S.Ct. 3000.

Counsel for the plaintiffs asked Dr. Carvajal about the phrasing of survey questions during cross-examination:

Q. Do you believe that the questions in your survey were framed to be clear, precise, and unbiased?

A. All probably with the exception of annual volume of business.

Q. And that was somewhat ambiguous and could have been interpreted in different ways by the respondents?

A. That is correct. And it was purposely designed that way so as not to raise the sensitivity of the respondents, and then it would be the interviewer that would try to do most of the talking in terms of eliciting a response.

Trial Transcript at 770. Survey respondents were simply asked to give a number for their firm's annual volume of business. It could not be clear to the respondent whether the question sought gross volume, net volume, construction volume, Miami–Dade County volume, volume for a particular product market, etc. Yet the responses to this ambiguous survey question formed the entire framework for Dr. Carvajal's study, and apparently had a substantial effect on the data given the inexplicably wide range of volume reported in the survey.

I will not attempt to catalog every aspect of the survey results which indicates that the data is unreliable. Instead, to show why I find the survey and study unpersuasive as the trier of fact, I will highlight a few of the most troublesome results as examples of the overall problem within the data set.

First, 11 engineering firms which appear in both the structural and civil engineering pools have been certified by the Department of Public Works and report that they have two structural and two civil engineers. The business volume reported by these 11 presumably comparable firms ranges from $250,000 to $423 million. This extraordinary difference cannot be attributed to discrimination, as the non-minority-owned firms in this group—presumably not subject to any discrimination—range in reported volume from $300,000 to $423 million. It is impossible to determine which, if any, of these volume figures is accurate. Additionally, because Dr. Carvajal admitted that he did not check the data for accuracy, *see* Trial Transcript at 600, I cannot determine if the errors were consistent across all the firms. This unexplained wide variation in volume calls all the data into question, because Dr. Carvajal's study was based on the annual volume reported in the survey.

Second, 19 structural engineering firms reported to the Department of Public Works that they have only one engineer. Nonetheless, the range of business volume reported in the survey by these one-engineer firms is between $45,000 and $100 million. Similarly, there were 37 civil engineering firms which reported only one engineer to the DPW. These one-engineer firms range in business volume from $100,000 to $500 million. I find it difficult, if not impossible, to believe that one structural engineer is generating $100 million in annual volume and one civil engineer is generating $500 million.

The County and the intervenors argue that these high volume figures were removed when Dr. Carvajal ran a variant of his regression equations with "outliers" deleted. The problem, however, is not with the inclusion of the high volume firms, but with the overall reliability of the volume data set. The County and the intervenors might also argue that since the volume figures were taken from the survey results, the number of engineers should also be taken from those results, rather than from the County's records. Even doing so, however, does not eliminate the variances. For example, six firms engaged solely in structural engineering reported having two structural engineers in their survey responses. These firms ranged in volume from $170,000 to $300 million.

These variances persist throughout the survey responses, and are completely unexplained. In fact, when examining solely the women-owned or Hispanic-owned firms, the variances remain. Nine women-owned firms appearing in both the structural and civil engineering pools report one structural and one or two civil engineers. The business volume range of these firms is between $40,000 and $30 million. Moreover, 15 Hispanic-owned firms appear in both the structural and civil engineering pools. These firms range

in reported volume from $40,000 to $30 million as well.

The wide discrepancies also persist throughout the architectural pool. These unexplained, obvious problems with the annual volume data render the entire study unreliable and inaccurate, and unpersuasive to me as the fact-finder under the strict scrutiny and intermediate scrutiny standards. The problem becomes quite apparent when one recognizes that Dr. Carvajal used the number of employees and number of professionals in a firm as proxies for measuring capacity. In doing so, he assumed that each employee and professional had a substantially similar effect on productivity. The numbers, however, belie that assumption. For example, employee productivity in the architectural firms ranges from $248 per employee (CH2M Hill, ID# 553), to $19,230,769 per employee (Pierce, Goodwin, ID# 600).[5] Architect productivity in these firms ranges from $20,000 (Eric Maspons, ID# 353) to $175 million (Rochlin, ID# 604).

These problematic variances are present throughout the entire study, whether using employees or architects, survey results or County data, or looking at architecture firms, or structural or civil engineering firms. In my view, the annual volume figure is creating these wide and unexplained variances, and calling into doubt the reliability of the entire study.

One last problem with the data used by Dr. Carvajal serves to highlight the unreliability of the study, and explain why it fails to convince me. Seven architectural firms reporting significant annual volume on the survey actually said they had *no* architects. Similarly, 18 of the 204 civil engineering firms (about 9%) with significant annual volume reported having *no* civil engineers, and 19 of the 159 structural engineering firms reporting some volume (about 12%) reported having *no* structural engineers. Without architects or engineers, the volume reported by these firms cannot be (or at least cannot solely be) attributed to architecture or engineering. The County and the intervenors have offered no explanation for the problems apparent with the annual volume of business data. Tellingly, Dr. Carvajal admitted at trial that "[w]e do have some problems in the data." Trial Transcript at 647. That, in my view, is a vast understatement.

### 3. CONCLUSION

Dr. Carvajal concluded in his study that there was a disparity in Miami–Dade County's A & E industry between the percentage of women-owned and Hispanic-owned firms in the industry and their percentage of the annual volume of business. The survey results of the firms' annual volume of business, which form the entire basis for the study and for Dr. Carvajal's conclusion, are unreliable, inaccurate, and unpersuasive. First, the data is both over- and under-inclusive as to the geographic market. Second, the study fails to properly measure the product markets by including volume for all aspects of a firm into each category. Finally, the unexplained cavernous variances in the numbers for similarly situated firms cast grave doubt on the entire process of gathering and analyzing the data. Accordingly, the study does not constitute "sufficient probative evidence" under intermediate scrutiny, and certainly not a "strong basis in evidence" under strict scrutiny, of discrimination against women and Hispanics respectively. Because Dr. Carvajal's conclusion that disparity exists is unreliable, it is not necessary to address the study's conclusion that the disparity is caused by discrimination.[6]

---

5. The ID numbers are taken from Plaintiffs' Exhibits 90 and 91.

6. The plaintiffs have also convincingly shown that Dr. Carvajal's regression analyses are not

One final matter warrants discussion. I have considered the Tenth Circuit's decision in *Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950 (10th Cir.2003), which the County says supports the constitutionality of the MWBE programs in the A & E sector. I do not, however, find *Concrete Works* persuasive. First, in the Tenth Circuit one who challenges an affirmative action program retains the ultimate burden of proving the program's unconstitutionality, and this allocation of the burden of proof conflicts with Eleventh Circuit precedent. *Compare Concrete Works*, 321 F.3d at 959, *with Johnson*, 263 F.3d at 1244. Second, I believe the Tenth Circuit's decision is flawed for the reasons articulated by Justice Scalia in his dissent from the denial of certiorari. *See Concrete Works of Colorado, Inc. v. City and County of Colorado*, — U.S. —, 124 S.Ct. 556, 557–60, 157 L.Ed.2d 449 (2003) (Scalia, J., dissenting from the denial of certiorari).

## B. Anecdotal Evidence

■ In addition to the statistical evidence, the intervenors presented anecdotal evidence regarding discrimination in Miami–Dade County's A & E industry. This anecdotal evidence was concerned exclusively with discrimination against women. There was no anecdotal evidence presented as to HBEs or BBEs.

The intervenors presented the testimony of Lourdes San Martin, P.E., Laura Perez, AIA, and Lundy Clarke, P.E., at the preliminary injunction hearing. These women professionals provided representative accounts of their dealings with the County in seeking work they were qualified to perform.

Ms. San Martin, a structural engineer since 1966, has worked on public projects in Miami–Dade County such as the James L. Knight Center and the mass transit Metrorail system. She has had her own engineering firm—the first such woman-owned firm in the County—since 1981. In 1983 her firm worked on a County project for a government parking garage through a joint venture with a white-owned firm. She has always tried to get work from the County, but did not secure her next County job until 1986–87, when she worked as part of a team on a parking project at the Miami International Airport. She and her firm were treated badly in that project (e.g., being paid a small amount of money). She complained to the County, but nothing was done. These are the only two contracts she has received in about 19 years of bidding on no-measure County contracts, and she attributes this poor record to "institutional discrimination."

In 1996 or 1997, Ms. San Martin applied as a prime consultant on another parking project at MIA. She was disqualified because she did not subcontract 15% of the contract to WBEs, and another WBE was awarded the contract. After the enactment of the MWBE programs, her experience has been satisfactory. Her firm has grown from 10 to 30 employees, and has diversified so that now only one-third of its work is structural engineering.

Ms. Perez is the majority owner of Laura M. Perez & Associates, an architecture firm. At the time of her testimony, the firm had been operating for just over 10 years. She testified that before the MWBE programs was enacted, her firm submitted 14 proposals for County projects and was not "short-listed" for any of them. She went on to state that since the programs were initiated, her firm had been "somewhat successful" in obtaining

statistically significant. Because I find, however, that the data upon which those regression analyses was based is unreliable, I need

not address the plaintiffs' arguments on this point.

County set-aside projects. Ms. Perez described her firm's success in the private sector as being prevented by a "block wall," and said that most women-owned companies do not have the private sector to balance out their business.

Ms. Clarke is a structural engineer practicing in Miami–Dade County. Her firm, C.R.A. Clarke, was founded in 1990. She testified that she was never "short-listed" for County projects, even though those projects were within her firm's area of expertise. Ms. Clarke went on to describe various instances where she felt her firm was excluded from projects due to her gender.

Nearly all of the anecdotal evidence related to discrimination in the award of County contracts. Dr. Carvajal's study indicated, however, that no disparity exists in that aspect of the A & E industry. The anecdotal evidence, therefore, contradicts, or at least is inconsistent with, the statistical evidence in the study.

In assessing the constitutionality of an affirmative action program, anecdotal evidence can be helpful, "but only when it [is] combined with and reinforced by sufficiently probative statistical evidence." *ECA*, 122 F.3d at 925. The Eleventh Circuit has instructed that "anecdotal evidence can play an important role in bolstering statistical evidence, but that only in the rare case will anecdotal evidence suffice standing alone." *Id.* This is not one of those rare cases.

The statistical evidence presented in this case is unreliable and fails to establish the existence of discrimination. Thus, analyzing it on its own, I find that the anecdotal evidence presented fails by itself to meet the evidentiary standards necessary for satisfying the first prong of the intermediate scrutiny standard. This evidence does not even approach the level of the anecdotal evidence in *ECA*, where County employees themselves testified that the Coun-

ty's practices allowed discrimination to persist. Even with that testimony before it, the Eleventh Circuit found such evidence insufficient to overturn Judge Ryskamp's findings. *See id.* at 924–26. The intervenors' anecdotal evidence is insufficient in this case as well given the lack of probative evidence of the disparity necessary to satisfy intermediate scrutiny.

I now address whether the HBE and WBE programs, respectively, are "narrowly tailored" or "substantially related" to the goal of remedying past and current discrimination. As explained below, they are not.

### IV. The Second Prong: "Narrow Tailoring" and "Substantial Relationship"

Although all racial and ethnic preferences are subject to strict scrutiny, "[c]ontext [nevertheless] matters" when reviewing such classifications under the Equal Protection Clause." *Grutter*, 123 S.Ct. at 2338. The same goes for gender preferences. *See, e.g., Hogan*, 458 U.S. at 725–26, 102 S.Ct. 3331. Some observations about the County's MWBE programs are therefore in order to preface the "narrow tailoring" and "substantial relationship" analyses.

### A. Minorities as Majorities

Affirmative action programs like the ones here, and the challenges to them, generally arise in situations where the elected representatives of a (usually white) majority population choose to enact preferences of one type or another to benefit groups which are minorities. Use of race, ethnicity, or gender in such circumstances is seen by some, instinctively if not legally, as discrimination that is permissible because it is generally benign and not invidious. *See, e.g.*, John Hart Ely, *The Constitutionality of Reverse Racial Discrimination*, reprinted in On Constitu-

TIONAL GROUND 269 (1996) ("regardless of whether it is wise or unwise, it is not 'suspect' in a constitutional sense for a majority, any majority, to discriminate against itself"). The assumption—from those at both ends of the legal, political, and analytical spectra—has always been that affirmative action, by definition, favors those in the minority. *Compare, e.g.,* DINESH D'SOUZA, THE END OF RACISM 219, 290–91 (1995), *with, e.g.,* STANLEY FISH, THERE'S NO SUCH THING AS FREE SPEECH . . . AND IT'S A GOOD THING TOO 61 (1994).

Like *Croson,* 488 U.S. at 495–96, 109 S.Ct. 706, this case does not fit neatly into the traditional affirmative action paradigm, for Miami–Dade County is a unique community—a place truly representative of the proverbial American melting pot. *See, e.g.,* Trial Transcript at 221. Putting aside the legal, sociological, and moral debates on affirmative action, in a place like Miami–Dade County it is foolhardy to ignore the reality that at least some groups which may constitute minorities in other parts of the country (or even the state) are majorities here. This is a product of many factors, including the County's proximity to the Caribbean and Latin America and long-term migration from countries like Cuba, but it is not a stretch to imagine the same sort of mix elsewhere given current demographic trends in the United States. *Cf. Sinkfield v. Kelley,* 531 U.S. 28, 30–31, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (discussing minority—majority districts).

As noted earlier, the MWBE programs provide "participation goals" of 25% for HBEs, 17% for WBEs, and 12% for BBEs. Yet in the County some of the "minorities" for whose benefit these programs were

enacted are not really minorities at all. The 2000 U.S. Census indicates that whites make up only a minority of the County's population. Persons of Hispanic or Latino origin constitute 57.3% of the County's population, with non-Hispanic whites at 20.7% and blacks at 20.3%. Women are also a majority in the County, constituting 51.7% of the population. *See* U.S. DEPT. OF COMMERCE, U.S. CENSUS BUREAU, 2000 CENSUS, Florida at 37, 76, 77. In 1990, the numbers were not much different. Persons of Hispanic origin made up 49.2% of the County's population, while Blacks were 20.5%, and non-Hispanic whites were 30.2%. Turning to gender, women constituted a majority with 52% of the population. *See* U.S. DEPT. OF COMMERCE, U.S. CENSUS BUREAU, 1990 CENSUS, Florida at 24, 189.[7]

These population figures, alone, may not be significant. After all, strength in population (voting age or otherwise) does not necessarily translate into, or guarantee, political power, access, or opportunity, and one should not lightly cast aside the years in which a group has been historically discriminated against or disadvantaged. But here there is more, as the County's population figures are roughly proportional to the makeup of the 13–member County Commission. *See* Trial Transcript at 116–17, 204–06, 296. Looking first at race and ethnicity, at the time of trial the Commission was made up of seven Hispanics (five men and two women: 53.8%), four blacks (two men and two women: 30.7%), and two non-Hispanic whites (both women: 15.3%). Moving on to gender, there were six female commissioners (two black, two Hispanic, and two non-Hispanic white: 46.1%). There were no white non-Hispan-

---

7. I take judicial notice of facts capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned, such as census data, under Rule 201(b) of the Federal Rules of Evidence. *See United States v. Phillips,* 287 F.3d 1053, 1055 n. 1 (11th Cir.2002) (taking judicial notice of census data). The 1990 and 2000 census data are available online at *<http://quickfacts.census.gov/qfd/states/12/12086.html>* (last visited July 20, 2004).

ic males on the Commission. In 1998, when this lawsuit was filed, the breakdown was similar. There were six Hispanics (four men and two women: 46.1%), four blacks (two men and two women: 30.7%), and three non-Hispanic whites (two women and one man: 23%). On the gender side, there were six women (two black, two Hispanic, and two non-Hispanic white: 46.1%). Of the seven male Commissioners, only one (7%) at the time was a white male.

Thus, some of the groups entitled to receive preferences under the County's MWBE programs are not really minorities at all—at least not in the community where the preferences operate—and the one purported majority group which is disadvantaged by the programs—white males—is in the minority. *See* William Marshall, *Conservatives and the Seven Sins of Judicial Activism*, 73 U. Colorado L. Rev. 1217, 1228 (2002) (explaining that, with the possible exception of minority-majority districts, whites are not political minorities "needing protection against political forces disinclined to represent their interests"). Some Commissioners testified that they viewed the participation goals as a means of allocating the economic pie among the groups they represented. *See, e.g.,* Trial Transcript at 127 ("people getting their fair share of the pot"), 237 ("a formula that will provide a certain level of participation in the community for various minority groups"), 257 ("proportioned share"), 399 ("fair share" based on notion of fairness), and 414 ("good percentage of the contracts"). Such comments, by themselves, may not raise eyebrows, for they may simply be an inartful way of describing the effect (or desired effect) of the MWBE programs. But they must be seen in conjunction with the constitutionally

flawed belief of some Commissioners that the MWBE programs may remain in place so long as the Commissioners believe in good faith that discrimination continues to exists. *See, e.g.,* Trial Transcript at 50, 53, 65, 95, 113, 125, 199–200, 219–20, 235, 256, 359, 397, 413. Consider, for example, the legally mistaken testimony of one Commissioner concerning who carries the burden in the affirmative action context: "I think that unless we have proof to discontinue, then we would assume that they [the MWBE programs] should be continued." Trial Transcript at 206. This was not an isolated view, as most Commissioners apparently felt comfortable keeping the MWBE programs in place even though they continued to wait for a disparity study that never seemed to come. *See, e.g.,* Trial Transcript at 66–67, 91, 96, 199, 396, 406.

Moving on to specifics, Hispanics constitute the majority racial/ethnic group in the County, and exercise political power on the Commission, where they also constitute a majority. It is probably not happenstance that Hispanics receive the highest participation goal (25%) among the groups given a preference. When population is considered in terms of gender, the situation is similar. Women constitute the majority group in the County, and come close to making up a majority on the Commission. Again, not surprisingly, women have the second-highest participation goal (17%). Although the County conceded the unconstitutionality of the BBE program, the picture for blacks fits into this pattern as well. Blacks are a minority in terms of population in the County and voting strength on the Commission. Not coincidentally, they get the lowest of the three participation goals (12%).[8]

---

8. Although blacks have the lowest participation goal, the County concedes that it cannot justify the BBE program under strict scrutiny. It asserts, however, that it can do

so for Hispanics. Although I do not rest my decision on it, it is counterintuitive to think that Hispanics in the County are suffering

What this means in terms of constitutional adjudication is not clear. One possible answer is that the scenario described above is nothing more than sound and fury,[9] because a historically disadvantaged minority is always (or at least usually) a disadvantaged minority for equal protection purposes. *See Gratz*, 123 S.Ct. at 2444 (Ginsburg, J., dissenting) ("Actions taken to burden groups long denied full citizenship stature are not sensibly ranked with measures to hasten the day when entrenched discrimination and its after effects have been extirpated."). This rationale may appear to have the benefit of being easily applied, but is not satisfactory, for it reinforces the unfair stereotypes and prejudices that are visited upon individuals because of common characteristics with which they are born—their race, ethnicity, or gender—and assumes, parochially, that such characteristics are so dominant that minority groups cannot achieve positions of power, or cannot affect those in positions of power, no matter how much time passes or how societal views evolve or mature. Another response is that the minority/majority status of a group or class must be measured by considering national (or at least state) demographics instead of localized ones. This too would presumably be simple in application. The problem with this macro view of affirmative action, however, is that it ignores the need for a government entity to justify preferences within its own geographic boundaries. *See Sherbrooke Turf*, 345 F.3d at 970–71. And if, as here, it is a local government which chooses to enact race-, ethnic-, and gender-based legislation, the composition of that jurisdiction and its governing institutions cannot be cast aside as irrelevant.

The notion that affirmative action is a free-floating label which can automatically sanitize preferences of all kinds is antithetical to the Equal Protection Clause. *See Grutter*, 123 S.Ct. at 2338 ("Not every decision influenced by race is equally objectionable ..."). *Cf.* JOHN RAWLS, JUSTICE AS FAIRNESS: A RESTATEMENT § 18.5, at 65 (2001) ("if men, say, have greater basic rights or greater opportunities than women, these inequalities can be justified only if they are to the advantage of women and acceptable from their point of view"). "The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race." *Adarand*, 515 U.S. at 228, 115 S.Ct. 2097. If a white majority passed legislation favoring whites over racial and ethnic minorities in the provision of A & E services under the guise of affirmative action, it would be impossible for that majority to conjure up a sufficient interest to support such overtly discriminatory measures. I certainly do not equate discriminatory practices by white majorities with the MWBE programs challenged here, and do *not* find that the MWBE programs are illegitimate uses of race, ethnicity, and gender. But the scenario described in this section demonstrates how important it is, on this record, that any race-, ethnic-, or gender-based remedies be appropriately tailored under the relevant legal standard, and it is to that issue that I turn next.

### B. "NARROW TAILORING" AND THE HBE PROGRAM

 Under the narrow tailoring prong of the strict scrutiny standard, government entities may only implement race- or ethnic-conscious measures as a "last resort." *See ECA*, 122 F.3d at 926 (citing

---

from discrimination in the A & E industry, but that blacks are not.

**9.** With apologies to the Bard. *See* WILLIAM SHAKESPEARE, MACBETH, ACT V, SCENE V (1606).

*Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 217 (4th Cir. 1993)). *See also Croson,* 488 U.S. at 519, 109 S.Ct. 706 (Kennedy, J., concurring in part and concurring in the judgment) ("the strict scrutiny standard ... forbids the use of even narrowly drawn racial classifications except as a last resort"). The Eleventh Circuit has identified four factors that should be taken into account when determining whether an ethnic-conscious program is narrowly tailored: (1) the necessity for the relief and the efficacy of alternate remedies; (2) the flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of numerical goals to the relevant labor market; and (4) the impact of the relief on the rights of innocent third parties. *See Ensley Branch,* 31 F.3d at 1569. Though these factors do not constitute a mechanical formula, they do provide a logical framework.

 For purposes of this discussion, I assume (contrary to my earlier findings) that Dr. Carvajal's study is generally reliable and persuasive and that it demonstrates discrimination against Hispanics. The study, however, fails to identify who is engaging in the discrimination, what form the discrimination might take, at what stage in the process it is taking place, or how the discrimination is accomplished.

Q. You would agree, wouldn't you, Dr. Carvajal, that even if we accept your conclusion that discrimination is occurring in the architectural and engineering services market in Dade County, that we can't tell from your analysis who is discriminating or where in the process the discrimination is occurring?

A. That is correct.

Q. So we can't identify from your studies the source of any discrimination, right?

A. That is correct.

Q. Can't identify anything about the supposed discrimination, right?

A. Other than the fact that it is occurring.

Trial Transcript at 711. Absent this information, it is virtually impossible to narrowly tailor any remedy, and the HBE program fails on this fact alone. Nevertheless, I will discuss a few of the numerous other problems with the County's HBE program.

 The Supreme Court has recently explained that although "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it "does ... require serious, good faith consideration of workable race-neutral alternatives that will achieve ... diversity[.]" *Grutter,* 123 S.Ct. at 2344, 2345. The County has failed to show the necessity for the relief it has chosen, and the efficacy of alternate remedies has not been sufficiently explored.

After the construction portion of these identical measures was held unconstitutional in *ECA,* the County enacted a CSBE ordinance, a race-, ethnic-, and gender-neutral program, for construction contracting. The County apparently recognized that most of the minority contractors who have trouble competing in the industry are smaller businesses, and that their lack of resources and experience may be what is actually accounting for their relative lack of participation in the market. After being informed by the County Manager in 1998 and 1999 that parity had been reached in the A & E industry, the County and its Commissioners considered a similar proposed CSBE ordinance. The Commissioners, however, voted not to implement the ordinance, and instead voted to continue applying race-, ethnic-, and gender-conscious contract measures in the award of A & E contracts, without any modification of the goals set in 1994. If

the small business ordinance is effective in the contracting industry—and there is no indication that it is not—then the County's failure to at least explore a similar program in the A & E industry in practice indicates that the HBE program is not narrowly tailored.[10]

In 1997, the County enacted a broad anti-discrimination ordinance. *See* County Code §§ 11A–1 *et seq.* This ordinance makes it unlawful for anyone to engage in conduct which could reasonably be included within a definition of racial, ethnic, or gender discrimination. *See* § 11A–43. It provides for investigation of complaints and for administrative and judicial enforcement. In addition to the imposition of civil fines, *see* § 11A–51, the ordinance provides (1) that anyone aggrieved by a violation can recover from the violator "any profit and/or overhead lost as a result of the discriminatory act" and (2) that a violator can be excluded from County contracting for up to five years. *See* § 11A–52.

This ordinance is extremely broad, and the sanctions are severe enough to encourage its use by aggrieved parties. Yet not a single witness at trial knew of any instance of a complaint being brought under this ordinance concerning the A & E industry. There are apparently only two possible explanations for this dearth of complaints: either (1) the ordinance is not being enforced, applied, or used; or (2) there is no widespread discrimination occurring.[11] If the former is true, then the HBE program cannot be implemented un-

less there is at least some evidence that enforcement has been attempted and proved futile. If the latter is true, then there may be no need for the HBE program. In either case, the HBE program is not narrowly tailored.

Furthermore, although the HBE program contains waiver provisions, those provisions are utterly inflexible in practice. Dr. Carvajal's study reveals that Hispanics have 50.2% of firm ownership in the Miami–Dade architectural field, 36.9% in the structural engineering field, and 38.2% in the civil engineering field. The participation goal for Hispanics under the MWBE ordinances is 25%. It is of course permissible to have participation goals that are *less* than a minority's percentage in the marketplace. *See ECA*, 122 F.3d at 927 n. 6 ("We see nothing impermissible about setting numerical goals at something less than absolute parity."). While the participation goals may not indicate a problem under the third factor—the relationship of numerical goals to the relevant market—they do indicate a very serious problem under the flexibility factor.

The HBE program (like the BBE and WBE programs) contains a provision requiring the County Commission to adjust the participation goals on an annual basis according to the results of a study conducted by the Department of Business Development. It is clear, however, that no such yearly studies were conducted between 1994 and 1998. And in 1998 and 1999, after this litigation ensued, the stud-

---

**10.** The County ultimately enacted a CSBE for the A & E industry, *see* County Code § 2–10.4.01, but only after the MWBE programs were enjoined.

**11.** *Compare Croson*, 109 S.Ct. at 726 n. 3:

Since 1975 the City of Richmond has had an ordinance on the books prohibiting both discrimination in the award of public contracts and employment discrimination by public contracts. The city points to no evi-

dence that its prime contractors have been violating the ordinance in either their employment or subcontracting practices. The complete silence of the record concerning enforcement of the city's own antidiscrimination ordinance flies in the face of the dissent's vision of a "tight-knit industry" which has prevented blacks from obtaining the experience necessary to participate in construction contracting.

ies prepared by the County Manager indicated that parity had been reached with respect to County dollars awarded and paid. In any event, there is no evidence that the participation goals have ever been adjusted, and flexibility in theory means little when there is rigidity in practice. *Cf. Gratz*, 123 S.Ct. at 2427–30 (university's undergraduate admissions policy of automatically distributing 20 points—or one-fifth of those needed to guarantee admission—to every single underrepresented minority applicant solely because of race was not narrowly tailored to advance interest in educational diversity); *Johnson*, 263 F.3d at 1254 (concluding that university's freshman admissions policy, which automatically granted an arbitrary "diversity" bonus to each non-white applicant at a stage of the admissions process, was not narrowly tailored: "This lack of flexibility is fatal to UGA's policy.").

The County and its Commissioners have been apparently content to allow the MWBE programs, including the HBE program, to continue indefinitely with the goals set in 1994 while ignoring the express requirement that yearly studies be conducted and that the goals be reviewed and adjusted. This lack of flexibility and accountability is even more problematic because none of the MWBE programs have built-in durational limits (e.g., a sunset provision after a certain number of years), and is flatly inconsistent with the Supreme Court's admonition that preferences subject to strict scrutiny "must be limited in time" because "[e]nshrining a permanent justification for [such] preferences would offend" equal protection principles. *See Grutter*, 123 S.Ct. at 2346.

In *Danskine*, for example, the Eleventh Circuit held that the failure to adjust a participation goal to comport with changes in the marketplace may render a program inflexible. *See Danskine*, 253 F.3d at 1300 ("Although the County asserts that the 36% goal is flexible, there is no evidence that it has ever altered that goal—even once—in the 17 years that the plan has been in operation."). Given that *Danskine* was applying the less exacting "substantially related" test of intermediate scrutiny, the HBE program at issue here is inflexible for the same reason under the "narrowly tailored" test. As the Seventh Circuit has put it, a local government may not "continue [a race-conscious] remedy in force indefinitely, with no effort to determine whether, the remedial purpose attained, continued enforcement of the remedy would be a gratuitous discrimination against nonminority persons." *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 647 (7th Cir.2001).

For the foregoing reasons, the HBE program is not narrowly tailored to meet the County's interest in remedying past and present discrimination. The County has failed to identify who is discriminating and in what fashion the discrimination is taking place. Moreover, alternate ethnic-neutral measures have not been adequately explored. Finally, the participation goals for the HBE program are inflexible in practice, so that they essentially operate as quotas. The record in this case is similar to that in *Florida A.G.C. Council, Inc. v. Florida*, 303 F.Supp.2d 1307, 1315–16 (N.D.Fla.2004), where a Florida statute granting preferences to minority business enterprises entering into contracts with state agencies was declared unconstitutional on the "narrow tailoring" prong.

### B. "SUBSTANTIAL RELATIONSHIP" AND THE WBE PROGRAM

■ A local government like the County is not required to implement a gender-conscious program only as a last resort. *See ECA*, 122 F.3d at 929. Intermediate scrutiny instead requires that the government program be substantially related to

the government's important interest. *See id.* Additionally, a gender-conscious program need not closely tie its numerical goals to the proportion of women-owned firms in the marketplace. *See id.; Ensley Branch,* 31 F.3d at 1582.

■ Nevertheless, the WBE program suffers from the same problems that are present in the HBE program, and it too fails to pass constitutional muster. Although intermediate scrutiny is less exacting than strict scrutiny, these problems indicate that the WBE program is not substantially related to the County's interest in remedying past and present discrimination against women in the A & E industry.

Once again, the failure of the County to identify who is discriminating and where in the process the discrimination is taking place indicates (though not conclusively) that the WBE program is not substantially related to eliminating that discrimination. Additionally, the existence of the County's anti-discrimination ordinance and the County's refusal to enact a small business enterprise ordinance for the A & E industry are also relevant. Although the County is not required to implement the WBE program only as a last resort, these other programs would likely be much more efficient in preventing and remedying the effects of discrimination.

Finally, as in *Danskine,* 253 F.3d at 1300, the lack of flexibility in the fixing of participation goals shows that the WBE program is not substantially related to the County's interest. The percentage of the A & E market occupied by women-owned firms could be substantially different in 1998, when this case began, than it was in 1994 when the participation goal was set. The County conducted no yearly studies, though required to do so by the MWBE programs themselves, to determine if the goals should be adjusted. In practice, therefore, the WBE program and its 17%

goal amounted to an impermissible and permanent set-aside. *See also Florida A.G.C. Council,* 303 F.Supp.2d at 1316 n. 9 (striking down gender preference in state contracting due to lack of "substantial relationship").

Accordingly, I find that the WBE program is not substantially related to the County's interest in remedying past and present discrimination against women in the County's A & E industry. The County cannot identify who is discriminating, making it difficult, if not impossible, to fashion a substantially related remedy. Moreover, the County's failure to adequately explore alternate remedies suggests that the WBE program does not satisfy the substantially related test. Finally, the inflexibility of the participation goal is fatal under *Danskine.*

## V. LIABILITY OF THE DEFENDANTS

The plaintiffs assert that they are entitled to compensatory and punitive damages for the violation of their constitutional rights by the County and its Commissioners. In this section, I address the liability of the defendants.

### A. THE COUNTY

■ Miami–Dade County is liable under § 1983 to the plaintiffs for any compensatory damages resulting from the unconstitutional MWBE programs. *See Morro v. City of Birmingham,* 117 F.3d 508, 514 (11th Cir.1997) ("[I]t is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.") (quoting *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This is because the Board of County Commissioners is the lawmaking

and policymaking body of Miami–Dade County. *See* County Code § 1.01(A) ("The Board of County Commissioners shall be the legislative and the governing body of the County and shall have the power to carry on a central metropolitan government."). The County Commissioners were clearly setting County policy when they enacted the MWBE programs by way of ordinances and when they voted to apply contract measures to particular A & E contracts. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir.1997). Accordingly, I find that the County is liable for any compensatory damages, as well as declaratory and injunctive relief. Punitive damages, however, may not be assessed against the County. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269–70, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

## B. THE COMMISSIONERS

The Commissioners assert that they have absolute immunity and/or qualified immunity. They argue that they are absolutely immune by virtue of the doctrine of legislative immunity. Qualified immunity applies, they also argue, because at the time they engaged in the unlawful conduct, the rights asserted by the plaintiffs were not "clearly established." The Commissioners alternatively argue that they should be immune from punitive damages because they acted in "good faith" in applying the MWBE programs to A & E contracts.

The former and current Commissioners who are defendants in this case are identified by name on page two of this order, but a brief review as to the makeup of the County Commission at certain times may nevertheless be helpful to the reader this many pages later. Those who are defendants in this case are highlighted in bold.

In 1994, when the HBE and WBE programs were enacted and the BBE program was amended, the County Commission consisted of Betty Ferguson, James Burke, Arthur Teele, Jr., Sherman Winn, Bruce Kaplan, Pedro Reboredo, Maurice Ferre, Larry Hawkins, Dennis Moss, Javier Souto, Miguel Diaz de la Portilla, Alexander Penelas, and Natacha Millan. Jimmy Morales was elected to the Commission in 1996. In 1998, Dorrin Rolle was appointed to replace Mr. Burke. Barbara Carey–Shuler replaced Mr. Teele in 1996. Mr. Winn was succeeded in September of 1994 by Gwen Margolis, who was replaced by Sally Heyman in 2002. Bruno Barreiro took over for Mr. Kaplan in 2000. Rebeca Sosa replaced Mr. Reboredo in 2001. Mr. Hawkins was succeeded by Katy Sorenson in October of 1994. Joe Martinez replaced Mr. Diaz de la Portilla in 2000. Miriam Alonso took over for Mr. Penelas in 1996, and she was replaced by Jose "Pepe" Diaz in 2002.

### 1. ABSOLUTE IMMUNITY

The plaintiffs seek compensatory and punitive damages from six former and current Commissioners in their individual capacities (Ms. Ferguson, Mr. Reboredo, Mr. Moss, Mr. Souto, Mr. Diaz de la Portilla, and Ms. Millan) for voting in favor of the MWBE programs in 1994. It is clear that these Commissioners are entitled to absolute immunity for their legislative actions. *See Bogan v. Scott–Harris*, 523 U.S. 44, 49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998); *Macuba v. Deboer*, 193 F.3d 1316, 1320 (11th Cir.1999). Accordingly, the votes of the six Commissioners in 1994 concerning the MWBE programs—enacting the HBE and WBE programs and amending the BBE program—cannot be the basis for a suit in damages, even if

there was a lack of evidentiary support for the programs, and even if the programs were not "narrowly tailored" under strict scrutiny or "substantially related" under intermediate scrutiny. The same goes for the decision of the Commissioners in 1998 and 1999 to not replace the MWBE programs with a CSBE ordinance and to keep the MWBE programs in place.

### 2. QUALIFIED IMMUNITY

 The plaintiffs also seek compensatory and punitive damages from all former and current Commissioners named as defendants, in their individual capacities, for their votes to apply the race-, ethnic-, and gender-conscious measures of the MWBE programs to contracts and to the process for selecting firms to provide A & E services for various County projects. The plaintiffs contend, and I agree, that the Commissioners' votes to impose specific contract measures—i.e., set-asides and goals—on various solicitations for A & E services, and to continue to apply the measures on specific contracts in the face of the advice from the County Manager that such action violated the County's own ordinance, are activities that do not constitute legislative action. Government officials are entitled to absolute legislative immunity only when they take actions that are "an integral part of the deliberative and communicative process by which [they] participate in ... proceedings with respect to the consideration and passage of legislation." *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). On the other hand, legislators' administrative acts, such as employment decisions, are not entitled to legislative immunity even though those decisions are made through votes. *See Smith v. Lomax*, 45 F.3d 402, 404–405 (11th Cir.1995) (rejecting "sweeping" claim that the "act of voting" renders "conduct immune" from suit). The decision as to whether to hire architects and engineers to work on Coun-

ty contracts, and whether to apply performance goals to their specific contracts, is closely akin to decisions relating to the hiring of employees. "A legislative act involves policymaking rather than mere application of existing policies. If the facts utilized in making a decision are specific, rather than general in nature, the decision is more likely administrative. Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir.1991). Accordingly, I conclude that the Commissioners were acting in an administrative, rather than legislative, capacity when they voted to apply performance goals to specific County A & E contracts, and therefore they are not absolutely immune. *See, e.g., Bryan v. City of Madison*, 213 F.3d 267, 272–74 (5th Cir.2000) (mayor's vetoes of site and development plan after approval by board of aldermen was not legislative); *Sunland Publishing Co. v. City of Jackson*, 234 F.Supp.2d 626, 630–31 (S.D.Miss.1999) (members of city council acted in their administrative capacities when they selected a printing contractor); *Lacorte v. Hudacs*, 884 F.Supp. 64, 70–71 (N.D.N.Y. 1995) (county legislators not entitled to absolute immunity for adopting resolution denying contract to lowest bidder).

 Although they participated in constitutionally impermissible conduct by applying the MWBE goals without the required constitutional predicate, the Commissioners may nevertheless be entitled to qualified immunity if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This does not mean, however, that the facts of previous cases must be "materially similar"

to the present situation. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The Supreme Court explained what is meant by "clearly established" in *Hope:*

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very act in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id.* (citations omitted). Accordingly, the question is whether the state of the law at the time the Commissioners voted to apply contract measures gave them "fair warning" that their actions were unconstitutional. *See id.* at 741, 122 S.Ct. 2508. *See also Groh v. Ramirez,* 540 U.S. 551, 124 S.Ct. 1284, 1293–94, 157 L.Ed.2d 1068 (2004) (holding that officer who prepared and executed invalid warrant—a warrant which did not describe the things to be seized—was not entitled to qualified immunity: "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid.").

In *Hope,* the Eleventh Circuit held that prison guards who handcuffed a prisoner to a hitching post for an extended period without water were entitled to qualified immunity because no previous cases contained "materially similar" facts sufficient to put them on notice. The Supreme Court reversed, holding that the standard applied by the Eleventh Circuit was too exacting. The Supreme Court held that the prison guards had fair warning that their actions were unlawful based on the state of the law at the time. *See* 536 U.S. at 739, 122 S.Ct. 2508 ("In assessing whether the Eighth Amendment violation

here met the *Harlow* test, the [Eleventh Circuit] required that the facts of previous cases be 'materially similar' to Hope's situation. This rigid gloss on the qualified immunity standard, though supported by Circuit precedent, is not consistent with our cases.") (internal quotation marks and citation omitted). The Supreme Court held that two binding cases were sufficient to put the defendants in *Hope* on notice. Neither of these cases was factually identical to the situation in *Hope,* but each provided a strong indication that the prison guards' actions were unconstitutional. The first case, *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974), held several forms of punishment unconstitutional, including handcuffing inmates to the fence and to cells for a long period of time. In the second case, *Ort v. White,* 813 F.2d 318 (11th Cir.1987), the Eleventh Circuit held that an officer's denial of water to an inmate in the situation at issue did not constitute cruel and unusual punishment. Nevertheless, the Supreme Court found that *dicta* in that case gave fair warning to the prison guards in *Hope.*

It is fair to say, I think, that there is significant internal disagreement among the judges in the Eleventh Circuit about what *Hope* means. Some cases state that *Hope* is nothing more than a blip on the radar screen of qualified immunity, and suggest that the Eleventh Circuit's prior jurisprudence was not out of step with Supreme Court decisions. *See, e.g., Willingham v. Loughnan,* 321 F.3d 1299, 1300 (11th Cir.2003) ("The Supreme Court decision in *Hope* ... did not change the preexisting law of the Eleventh Circuit much.... Decisions of this court before the Supreme Court's *Hope* decision demonstrate that the law of the Circuit harmoniously complies with the Supreme Court's reminder."). Other cases describe *Hope* as a sea change in Eleventh Circuit qualified immunity law. *See, e.g., Holloman ex*

*rel. Holloman v. Harland,* 370 F.3d 1252, 1278 (11th Cir.2004) ("*Hope* reminds us that we need no longer focus on whether the facts of a case are 'materially similar to prior precedent.' ... *Hope* [also] seems to have abrogated many of the other [qualified immunity] standards articulated in *Wood [v. City of Lakeland,* 203 F.3d 1288, 1291–92 (11th Cir.2000) ], as well."). Fortunately, this is not a case where post-*Hope* conflicts in Eleventh Circuit law affect the result. Even under the most narrow reading of *Hope,* it is easy to conclude that the Commissioners are not entitled to qualified immunity.

The Commissioners had before them at least three cases that gave them fair warning that their applications of the MWBE programs to A & E contracts were unconstitutional: *Croson, Adarand,* and *ECA.* Each held that affirmative action programs like the MWBE programs could not be enacted or maintained without a strong basis in evidence of discrimination (or a sufficient probative basis of discrimination for gender-conscious remedies). *Croson* was decided a full five years before the MWBE programs were enacted in their present form in 1994. In fact, the Fourth Circuit has held that the principles articulated in *Croson* were "clearly established" by 1993:

> In 1989 the Supreme Court's decision in *J.A. Croson* (affirming our 1987 decision striking down an affirmative action program) should have put all reasonable administrators of local affirmative action programs on notice that their programs would be subject to strict scrutiny ... Thus we believe that the individual defendants have not established their entitlement to qualified immunity because case law (about which a reasonable official would have known) had clearly established by 1993 and 1994 that the department's affirmative action program failed to satisfy the strict requirements of the Equal Protection Clause.

*Alexander v. Estepp,* 95 F.3d 312, 317–18 (4th Cir.1996) (denying qualified immunity to county officials who rejected firefighter applicants by applying affirmative action program that was unconstitutional under *Croson* ). *See also Maitland v. University of Minnesota,* 155 F.3d 1013, 1019 (8th Cir.1998) (denying immunity to university president and board members who agreed to salary plan "when they had strong reason to believe that a likely result of the plan would be to create a salary imbalance in favor of female academic employees").

It is not necessary, however, to base the denial of qualified immunity solely on *Croson.* First, when Commissioners voted in 1996 and later to apply the goals in the MWBE programs to A & E contracts, the Supreme Court had already decided *Adarand.* Second, and maybe more importantly, the construction portions of the County's MWBE programs were struck down by the Eleventh Circuit in October of 1997 in *ECA,* and despite this adverse ruling the Commissioners continued to apply the MWBE goals to contracts that came before them. In other words, the case law giving the Commissioners fair warning in this case was much more "clearly established" than the case law discussed in *Hope,* and the Commissioners should have known that the MWBE programs were unconstitutional absent a new study or additional evidence providing the requisite factual support.

But there is even more. As explained below, numerous other factors indicate that the Commissioners had fair warning and are not entitled to qualified immunity.

In *Hope,* the Supreme Court noted that its finding that the guards violated clearly established law was buttressed by the fact that the Department of Justice had specifically advised the Alabama Department of Corrections of the unconstitutionality of its practices before the incidents in the case

took place. The DOJ conducted a study into the Alabama prison system's use of hitching posts, and advised Alabama to cease using them as a form of punishment. The Supreme Court explained that "[a]lthough there is nothing in the record indicating that the DOJ's views were communicated to [the guards], this exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment prohibition against cruel and unusual punishment." *Hope*, 536 U.S. at 744–45, 122 S.Ct. 2508.

In this case, the County Manager and the Department of Business Development specifically informed the Commissioners in 1998 and 1999 of the inherent problems in continuing to apply the contract measures and participation goals in the MWBE programs in the A & E context. The Commissioners were even provided with two internal studies (one based on dollars awarded and one based on dollars paid), both of which demonstrated that parity had been reached.

Furthermore, the Commissioners failed to do what the MWBE programs themselves required. As noted earlier, each of the MWBE programs at issue in this case require a yearly review, based on a study, of the goals and contract measures so that those goals can be re-evaluated. Yet no studies or reviews were conducted until this case was filed, and the Commissioners continued to apply MWBE goals and measures to A & E contracts.

In sum, the Commissioners had fair warning as of 1995 that their administrative actions in voting to apply race-, ethnic-, and gender-conscious contract measures in the award of County A & E contracts were unconstitutional given that the requisite evidence of discrimination was lacking. At the latest, the law was clearly established in October of 1997,

when the Eleventh Circuit decided *ECA*. Accordingly, the Commissioners are not entitled to qualified immunity, and are subject to individual liability for any compensatory and punitive damages.

## VI. DAMAGES

### A. COMPENSATORY DAMAGES

 Under § 1983, damages for violations of constitutional rights are determined according to the principles derived from the common law of torts. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 257–58, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Compensatory damages, therefore, are "damages grounded in determinations of plaintiffs' actual losses." *Stachura*, 477 U.S. at 307, 106 S.Ct. 2537. The abstract value of a constitutional right may not form the basis for compensatory damages in a case such as this one. *See id.* at 308, 106 S.Ct. 2537; *Piphus*, 435 U.S. at 264, 98 S.Ct. 1042; *Slicker v. Jackson*, 215 F.3d 1225, 1230 (11th Cir.2000).

 There are few cases discussing, much less analyzing, how compensatory damages should be calculated in a case involving corporate plaintiffs challenging affirmative action programs. In *W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206, 219–20 (5th Cir.1999), a case involving a challenge to a municipal minority business enterprise program, the Fifth Circuit affirmed an award by the district court of $11,600 in lost profits to a nonminority contractor because the district court had found that the contractor's bid had been "rejected for failure to comply with" the program. The opinion is not of much help, however, because "no arguments were presented contesting the amount of damages awarded," *id.* at 220, and there is no discussion of the district

court's methodology. In *Chalmers v. City of Los Angeles*, 762 F.2d 753, 759–60 (9th Cir.1985), where a street vendor was prevented from conducting business due to conflicting ordinances which denied her due process, the Ninth Circuit held that—in order to make the vendor whole—compensatory damages could be based on the vendor's initial set-up cost plus net profits, and that the jury's award of $15,723 was not excessive.

Under a traditional lost profits analysis, the plaintiffs have utterly failed to prove they suffered any actual losses from the existence of the MWBE programs or the application of contract measures to the award of County A & E contracts. The evidence in no way indicates how (or to what extent) the plaintiffs were injured by the County's MWBE programs. *See, e.g., American Marine Rail v. City of Bayonne*, 289 F.Supp.2d 569, 589 (D.N.J.2003) (rejecting lost profits claim in § 1983 action challenging denial of inclusion in municipal solid waste program: "The plaintiff's evidence is deficient on a crucial aspect of its lost profits claim—namely, it has set forth no credible evidence that a contract with NYCDOS was pending or even reasonably probable.... Furthermore, numerous variables in the procurement, bidding, and selection process break the chain of causation necessary to support an inference that defendants' alleged conduct caused lost profits.").

The testimony of Mr. Gill reveals the deficiency of proof on lost profits. Mr. Gill submitted proposals for few County jobs, and did not make any proposals in the first half of 2000. *See* Preliminary Injunction Transcript at 49–50; Trial Transcript at 449. No evidence in the record indicates how many jobs Mr. Gill submitted proposals for, the value of those

jobs, or his relative rate of success in being awarded County projects. Without such evidence, it is difficult, if not impossible, to determine the actual losses suffered by Hershell Gill Consulting. The same is true of Brill and Rodriguez, Inc.[12] Mr. Gill certainly was not required to submit proposals for every job in order to be able to recover lost profits, but it is not permissible for the plaintiffs to rely on sheer speculation either. It is telling that Mr. Gill admitted that he really could not measure the effect of the MWBE programs on his firm's profits, and agreed that such a calculation would be speculative. *See* Preliminary Injunction Transcript at 30–31. Furthermore, no expert testimony (or lay testimony for that matter) was presented by either of the plaintiffs on lost profits.

Mr. Gill did testify that his firm would have sought much more County work had he not been deterred by the MWBE programs. *See* Trial Transcript at 452. This testimony, however, conflicts with other evidence. Between October of 2000, when the preliminary injunction was entered prohibiting the County from utilizing set-asides or goals in the award of its A & E contracts, and the end of trial in November of 2001, Hershell Gill Consulting submitted only *one* proposal for County work. *See id.* at 455–56. Moreover, Mr. Gill testified that his firm does not submit proposals for all County A & E contracts, and that, as a practical matter, a firm needs experience in a specific area to have a real shot at getting a contract. For example, Mr. Gill does not feel qualified in all areas of engineering, and therefore does not submit bids on all available contracts. *See* Preliminary Injunction Transcript at 47; Trial Transcript at 447–49. I find, as a factual matter, that even in the absence of the MWBE programs, Hershell Gill Con-

---

**12.** There is no evidence on the record to indicate what actual losses Brill and Rodriguez might have sustained, as no one from Brill and Rodriguez testified.

sulting would not have submitted proposals for the great majority of A & E contracts let by the County. For Hershell Gill Consulting, public work was of interest only every once in a while.[13] The situation is even worse for Brill and Rodriguez, as there is no probative evidence concerning that company's interest or success in obtaining County work.

Apparently realizing their inability to prove damages under a traditional lost profits paradigm, the plaintiffs offer various alternative methods of calculating compensatory damages. I address, and reject, each of these alternatives below.

The plaintiffs suggest that I use the value of contracts affected by the MWBE programs (either by set asides or participation goals), and offer various different calculations for the 1995–1999 period: (1) all A & E contracts set aside for MWBEs ($62.6 million); (2) all contracts set aside for MWBEs plus all A & E contracts with participation goals for that same period (approximately $474 million); (3) all A & E contracts set aside in which engineering was a required specialty ($15.9 million); (4) all A & E contracts set aside in which engineering was a required specialty plus the A & E contracts with participation goals in which engineering was a required specialty ($161.7 million); or (5) all A & E contracts set aside for MWBEs which required an engineering prime consultant ($8.4 million). Each of these calculations is flawed, and severely so, and if accepted would result in a massive and undeserved windfall for the plaintiffs. First, the huge numbers suggested by the plaintiffs, for instance, dwarf the annual volume capacity of Hershell Gill Consulting, which was approximately $800,000 in 1999. *See* Trial Transcript at 455. Second, the plaintiffs have presented no evidence indicating for what percentage of those projects they

were even qualified to submit proposals. Third, the plaintiffs offered no evidence as to whether they could have taken on any additional work resulting from County A & E contracts. For example, at the time of the preliminary injunction hearing, Hershell Gill Consulting employed six engineers (three licensed) and two CAT operators. In 1998 and 1999, the company was at full capacity and had four and five engineers, respectively. *See* Preliminary Injunction Transcript at 420. Fourth, the plaintiffs have not introduced probative evidence showing what percentage of those contracts they would have successfully obtained (or likely would have obtained) had it not been for the MWBE programs. Fifth, alternatives (1) and (2) incorrectly assume that the plaintiffs would have submitted proposals and been successful on all A & E contracts, regardless of what type of work those contracts involved, and alternatives (3), (4), and (5) improperly lump all A & E contracts involving engineering into one category, without differentiating between types of engineering specialties (as Mr. Gill testified was necessary). In sum, short of throwing darts at a board, no award of compensatory damages can be reasonably determined on this record. The plaintiffs have simply not met their burden of proving compensatory damages.

Alternatively, the plaintiffs also propose that I estimate the "lost opportunity cost" to them—in essence a proxy for lost growth—by extrapolating from the A & E contracts with set-asides or goals. Depending on which figures are used—the plaintiffs propose various different base numbers—the plaintiffs say I should determine the number of contracts from which they were excluded and then take 12% of the value for contracts in which an architecture firm was the prime, and 50% of the

---

**13.** On one occasion, for example, Mr. Gill withdrew his firm's proposal and declined to make a presentation to the County. *See* Preliminary Injunction Transcript at 34, 42.

value of the contracts in which an engineering firm was the prime, numbers taken from the testimony of Ms. Perez. The total "lost opportunity cost," under this theory, would be 15% of $8.7 million for Hershell Gill Consulting ($1.3 million) and 15 % of $9.8 million for Brill and Rodriguez ($1.47 million), taking into account not only what the plaintiffs would have realized from A & E contracts, but also the prestige and experience those contracts would have provided.

The first problem for the plaintiffs is that the contracts used for the exclusion variable are overinclusive—it is wrong to assume that the plaintiffs would have been competitors for all of these A & E contracts. As noted earlier, Mr. Gill rejected the notion that an engineering firm like his would (or could) successfully bid on all contracts involving engineering, no matter the sub-specialty, and agreed that any drag on growth "can't be measured." *See, e.g.,* Preliminary Injunction Transcript at 31. The second problem for the plaintiffs is that most of the evidence for the "lost opportunity cost" theory comes from the intervenors, and I decline to award damages in the seven figures based on the assumption that Mr. Gill's firm would have grown at the same pace as Ms. San Martin's firm. A comparison between a mere two firms, in the absence of any additional lay or expert testimony on the effect on growth of economic conditions, inflation, or the job market, is not persuasive to me as the fact-finder. Neither is Mr. Gill's conclusory testimony that his firm would have been able to grow absent the MWBE programs.

Finally, the plaintiffs argue that I should award so-called presumed damages in lieu of compensatory damages for proven economic losses. Individuals, of course, may recover damages for actual harm other than monetary loss under § 1983, such as emotional distress and pain and suffering. *See Slicker,* 215 F.3d at 1230–31. The plaintiffs, however, are corporate entities, and as such may not recover those types of damages, *see, e.g., Oti Kaga, Inc. v. South Dakota Housing Development Authority,* 188 F.Supp.2d 1148, 1161 (D.S.D.2002), so they are left to ask for presumed damages. Such damages "may possibly" be appropriate where "a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish." *Stachura,* 477 U.S. at 310–11, 106 S.Ct. 2537.

I very much doubt that corporations should be treated like individuals insofar as presumed damages are concerned. *Cf. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 793 n. 16, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (Brennan, J., dissenting) (addressing First Amendment limits on damages in defamation context: "The commercial context does not increase the need for presumed damages, but if anything reduces the need to presume harm."). The Supreme Court said long ago, albeit in a case involving state law, that "as a corporation cannot be said to have life or health or senses, the only ground on which it can obtain either damages or an injunction ... is injury to its property," *Northern Pacific R. Co. v. Whalen,* 149 U.S. 157, 163, 13 S.Ct. 822, 37 L.Ed. 686 (1893), and I have found no cases awarding presumed damages to corporations whose constitutional rights have been violated. But even assuming that the plaintiffs can theoretically obtain such damages, they are not appropriate here. In this case the economic damages are somewhat difficult to establish, but not impossible. The plaintiffs—who put most of their eggs in the liability basket—simply did not present sufficient evidence, lay or expert, to substantiate their lost profits or "lost opportunity cost" theories.

The Eleventh Circuit has "held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury." *Slicker*, 215 F.3d at 1231. *See also Carey*, 435 U.S. at 266, 98 S.Ct. 1042 (holding that violations of constitutional rights should be actionable for nominal damages without proof of actual injury). I find, therefore, that nominal damages are appropriate in this instance, and assess those nominal damages at $100 for each of the plaintiffs. Miami–Dade County and the Commissioners in their individual capacities are jointly and severally liable for these damages.

I reject, as meritless, the plaintiffs' argument that I should set nominal damages at $3.1 million, or 5% of the value of all County A & E contracts with set-asides, as well as the plaintiffs' unsupported assertion that what is nominal should be looked at from the defendants' financial perspective. First, the plaintiffs' suggested approach comes close to turning nominal damages into a type of punitive damages. Second, although nominal damages need not be limited to $1 as a matter of federal law, *see, e.g., Romano v. U–Haul Int'l*, 233 F.3d 655, 671–72 (1st Cir.2000), they should be minimal because they represent a "mere token" award to a prevailing plaintiff who cannot substantiate any loss or harm from a constitutional violation. *See, e.g., Magnett v. Pelletier*, 488 F.2d 33, 35 (1st Cir.1973) (reducing nominal damages award in civil rights case from $500 to $1).

## B. PUNITIVE DAMAGES

The last aspect of this case, and one that I have given a great deal of thought to, concerns the plaintiffs' request for punitive damages against all of the named Commissioners in their individual capacities. The plaintiffs request an award of $225 million—this is not a misprint—based on 5% of the County's annual gross revenue.

In "some circumstances," punitive damages may be awarded for a constitutional violation even without a showing of actual loss by the plaintiff, *see Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir.1994), but only when the defendants' conduct involves "evil motive or intent or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). *See, e.g., Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir.1996) (upholding punitive damages award of $500 against one correctional officer who took prisoner out of cell, cut his hair, beat him, and uttered racial slurs, where prisoner recovered only nominal damages). The purpose of punitive damages is "[t]o punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." RESTATEMENT (SECOND) OF TORTS, § 908(1) (1977). *See also Stachura*, 477 U.S. at 306 n. 9, 106 S.Ct. 2537; *Carey*, 435 U.S. at 257 n. 11, 98 S.Ct. 1042. "Punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of future sanctions to achieve punishment or deterrence." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Although it is a close call, I decline to award punitive damages for a number of reasons.

First, I do not find that the Commissioners voted to apply MWBE set-asides and goals in A & E contracts with evil motive or callous indifference (i.e., recklessness) to the plaintiffs' constitutional rights. Using the common law as an analogy, *see Stachura*, 477 U.S. at 306, 106 S.Ct. 2537, determining whether or not tortious conduct passes from the merely negligent to the reckless—a matter involving state of mind—in a case like this one is not easy, and requires analyzing shades of gray.

No algebraic formulas are available to simplify the task.

The Commissioners were certainly lax and inattentive to their duties. They should have checked to make sure that the required yearly studies were prepared, and when told that parity had been reached, should have ensured that the County conducted a thorough analysis of what evidentiary bases, if any, existed for the MWBE programs in A & E contracting. They did neither. In light of what had happened in the *ECA* litigation, the citizens of Miami–Dade County certainly deserved more of their Commissioners with respect to a matter as important as affirmative action.

This does not mean, however, that the conduct of the Commissioners rises to the level warranting punitive damages. For example, in 1998, after the Eleventh Circuit decision in *ECA,* the Commissioners ordered the County Manager to conduct "a broader disparity study." Trial Transcript at 288. Unfortunately, the matter somehow fell through the cracks, and the study was not prepared. *See* Trial Transcript at 289. When no study was forthcoming, the Commissioners should have inquired as to what was holding it up, but this failure falls short of egregious and outrageous conduct warranting exemplary damages. In addition, I do not believe that punitive damages are needed for deterrence. Currently pending before me is a case concerning another aspect of the County's MWBE programs, *see 50 State Security, et al. v. Miami–Dade County et al.,* No. 01–268–Civ–Jordan, and that matter has been stayed until this action is resolved. Should that case proceed to trial, and should the record be as constitutionally deficient as it

was here, there will be a need for deterrence, and punitive damages will be a virtual certainty.

Second, punitive damages require an individualized, and highly contextualized, analysis. In a given case, different individuals who may have engaged in the same unconstitutional conduct may fare differently with respect to punitive damages depending on various factors, including state of mind. The plaintiffs, however, have lumped all the Commissioners together in their punitive damages analysis, no matter how different each Commissioner's intent and reasons for continuing to apply the MWBE programs to A & E contracts. Such group analysis may be appropriate for issues related to liability and qualified immunity, which focus at least to an extent on objective behavior, but is not the right approach for exemplary damages. I could, of course, scour the record in an effort to do the sort of review that is required, but will not undertake the analysis that the plaintiffs have chosen to forego.

Third, the plaintiffs, with their modest request of $225 million in punitive damages based on a percentage of annual County revenues, are improperly seeking to affect the County's pocketbook. Punitive damages are not available under § 1983 against a municipality, and the plaintiffs cannot try to get around this reality by seeking a sum so high that only the County could pay it.[14]

Fourth, even if the Commissioners acted recklessly, I decline, in the exercise of my discretion as the fact-finder, to award punitive damages. No civil rights plaintiff has an entitlement to punitive damages, even upon the requisite showing.

---

14. In cases where only nominal damages are awarded to civil rights plaintiffs, punitive damages awarded in the federal courts generally top out at around $15,000. *See generally Williams v. Kaufman County,* 352 F.3d 994,

1016 n. 78 (5th Cir.2003) (surveying cases). Had punitive damages been warranted against any of the Commissioners, I would have set them no higher than $1,500.00, or 25% of a Commissioner's yearly salary.

This is because such damages "are never awarded as of right, no matter how egregious the defendant's conduct." *Smith*, 461 U.S. at 52, 103 S.Ct. 1625. The trier of fact must still decide whether the "conduct merits a punitive damages award." In this "discretionary moral judgment," *id.*, I answer the question in the negative.

## VII. RELIEF

Our Constitution rightly frowns upon treating people differently based on immutable characteristics, but the Supreme Court has said, most recently in *Grutter*, that there is room for affirmative action under the right circumstances. For the second time in less than a decade, the County has failed to justify its MWBE programs. As a result, the County and its Commissioners will have to pay hundreds of thousands of dollars in attorney's fees and costs.[15]

If the County and its Commissioners wish to use race, ethnicity, or gender in their future contracting decisions, particularly in a multi-cultural community like this one, they cannot simply decide that such a step, in their view, is good public policy. They must also make sure that their policy is constitutional under the governing legal standards. If they do not, the consequences will be severe.

The record here does not come close to satisfying the Equal Protection Clause of the Fourteenth Amendment in any respect. Accordingly, the County's MWBE programs—in particular the BBE, HBE, and WBE programs (§§ 2–8.2, 2–8.2.3, and 2–8.2.4 of the County Code)—are unconstitutional as applied to contracts for A & E services, and may no longer be enforced or used. The plaintiffs, like all other engineering and architecture firms, are entitled to submit responses to the County's RFPs for A & E work and to have their responses considered without regard to the gender, racial, or ethnic character or membership of the prime consultant, the prime's subconsultants, or the prime's joint venture partners.

The County, its Commissioners, and the County Manager are permanently enjoined from using, or requiring the use of, gender, racial, or ethnic criteria in deciding (1) whether a response to an RFP submitted for A & E work is responsive, (2) whether such a response will be considered, and (3) whether a contract will be awarded to a consultant submitting such a response.

Each of the plaintiffs is entitled to an award of $100 in nominal damages, and to reasonable attorney's fees and costs, *see* 42 U.S.C. § 1988, for which the County and the Commissioners will be jointly and severally liable.

A final judgment will be issued separately.

---

**15.** In *ECA,* the County paid $401,897.00 in attorney's fees and costs.